UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **PATRICIA DODD** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *v.* | § | CIVIL ACTION NO. _____ |
| | § | |
| **ROBERT GLASER, IN HIS OFFICIAL** | § | **JURY DEMANDED** |
| **CAPACITY; CESAR MALDONADO, IN** | § | |
| **HIS OFFICIAL CAPACITY; AND** | § | |
| **HOUSTON COMMUNITY COLLEGE** | § | |
| | § | |
| *Defendants.* | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT AND REQUEST FOR JURY TRIAL**

Plaintiff Patricia Dodd brings this suit against Robert Glaser, in his official capacity (herein "Glaser"), Cesar Maldonado, in his official capacity (herein "Maldonado"), and Houston Community College (herein "HCC" or "the college") and asserts the following:

**I.**
**BRIEF SUMMARY OF CLAIMS**

1.      Sexual exploitation and harassment of female employees at HCC is grotesque and widespread.  The two most powerful policymakers at the college are male — defendants Glaser[1] and Maldonado[2] — whom both have engaged in repetitive, flagrant, sometimes grotesque bullying and vile sexual exploitation of vulnerable subordinate female employees at the college. Other male

---

[1] At all relevant times alleged in this case, unless specified otherwise, Robert Glaser served as the Chair of the HCC Board of trustees.
[2] At all relevant times alleged in this case unless specified otherwise, Cesar Maldonado served as Chancellor of HCC, also sometimes referred to as the Chief Executive Officer of HCC.

supervisors have emulated their wrongdoing at the college without reasonable correction or redress.

2.      Glaser's and Maldonado's sexual wrongdoing has variously included having sexual relations with an incapacitated female employee who was unable to give consent to such conduct; tampering with a witness to limit what she would reveal about sexual harassment; threatening HCC law enforcement officers with termination of their jobs if they asked too many questions about Maldonado's sexual exploitation of his subordinate female paramour, as well as repeatedly turning a blind eye to other male supervisors' sexually harassing actions toward subordinate female employees.  Such conduct is so widespread at HCC it is effectively the *de facto* custom, pattern, and practice of the college to permit, indulge and tolerate male sexual harassment of vulnerable female employees.

3.      This case presents the disturbing sexual harassment and exploitation of unmarried Plaintiff by the married Chairman of HCC's Board of Trustees, Robert Glaser.  Glaser's sexual misconduct was facilitated by and mirrored similar sexual misconduct of the Chancellor of the college, Cesar Maldonado.  Maldonado was aware of Glaser's relationship with Plaintiff; he facilitated the misconduct by allowing Glaser to be copied on Plaintiff's college emails and did nothing to stop Glaser's visits to Plaintiff's campus and classes during the academic semester—activity that is normally not permitted without prior notification to appropriate college authorities in Maldonado's office.  And, based on information and belief, Maldonado authorized an out-of-state trip for Glaser—paid for with public taxpayer dollars— during which Glaser paid for Plaintiff to travel along early so he could have three (3) days of hedonic sex with her while staying in the same room at a 5-Star hotel in Washington, DC.  Glaser pledged to help Plaintiff with her administrative problems at the college in exchange for having a sexual relationship with her.

4.     The Chancellor was not innocent in what Glaser was doing.  Maldonado's own sexual harassment of his subordinate paramour set the example for other male supervisors to harass and exploit their female subordinates —a fact Glaser brought up to Plaintiff to justify his own sexual misconduct.  How could he be reprimanded when the CEO of the college was doing the same thing without suffering any adverse consequences.[3]  As the head administrative policymaker at HCC, Maldonado's actions and decisions reflected the *de facto* policy, custom, and practice of the college, allowing male supervisors[4] to satisfy their sexual desires at the expense of female employees. Moreover, because Maldonado was guilty of sexually harassing his female employee, it provided license to others around the college to do likewise.  For a fuller discussion, *see* Pages 16-17, *infra*.

5.     Because the two most powerful policymakers at HCC had adopted and promoted the *de facto* policy and practice of sexually exploiting female employees, their conduct was the college's effective policy. If the authorized policymakers approve a subordinate's decision and the basis for it, such ratification is chargeable to the governmental entity because their decision is final. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion) (the conduct of the policymaker can establish the policy, practice, or custom of a governmental entity.)

6.     Ultimately, when Plaintiff demanded Glaser's requests for sex stop, Glaser withdrew his perceived support of Plaintiff, HCC retaliated and refused to renew her employment

---

[3] Once when Plaintiff complained to Glaser that what he was doing to her was not right, Glaser shot back that Maldonado was doing the same thing with his lover and therefore what he was doing was okay as well.

[4] Preliminary investigation suggests that all of the following individuals may have had information about how acts of sexual predation and sexual harassment were tolerated, excused, and ignored at HCC: Maldonado, Glaser, and HR director Janet May; former HCC Police Chief Greg Cunningham, Charles (Chuck) Smith, Ana Belasquez, Melissa Gonzalez, James Bailey, Brandy Griffin, Fredrick Portis, David Cross, and officers at the Houston Police Department, Harris County Sheriff's office, and HCC police department.

contract after 8+ years of teaching at the college.[5]. The decision not to renew Plaintiff's teaching contract occurred just days after she filed her EEOC sexual harassment complaint against the Defendants.

7.      Plaintiff brings this suit against HCC for knowingly violating her right to bodily integrity under color of state law—a right guaranteed to her under the Fourth and Fourteenth Amendments to the Constitution and Title VII of the Civil Rights Act of 1964, actionable by 42 U.S.C. §1983.  Plaintiff also sues Maldonado and Glaser for ratifying the *de facto* custom, practice, and policy of allowing unaddressed sexual harassment and *quid pro quo* sexual harassment of female employees —which she was a victim of—to go without correction. *See e.g., Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 452 (5th Cir. 1994) (en banc) (concluding that sexual assaults can never serve a legitimate state interest and are actionable against a public entity under 42 U.S.C. §1983.) The right to bodily integrity also includes the right to be free from arbitrary and capricious government action that shocks the conscience and violates the decencies of civilized conduct. Thus, both Glaser and Maldonado, acting under color of state law, violated Plaintiff's constitutional, federal, and state rights to be free from sexual assault and sexual harassment perpetrated by a state actor under color of state law.

## II.
## JURISDICTIONAL AND VENUE ALLEGATIONS

8.      This Court has jurisdiction over the claims asserted in this suit under 28 U.S.C. § 1331 because claims asserted herein arise under federal law, the Constitution of the United States, and are enforceable in this court pursuant to 42 U.S.C. § 1983 and Title VII of the Civil Rights

---

[5] HCC will contend it did not renew Plaintiff's employment contract because she had been arrested and she failed to report the arrests even though she was not convicted of any crime.  Plaintiff intends to show that other HCC employees have been arrested, not convicted, and have not had their employment terminated at the college and that HCC's explanation is merely pretextual.

Act of 1964.  The relevant conduct and *de facto* customs and practices of the college and the named policymakers violated Title VII of the Civil Rights Act of 1964, rights protected in 42 U.S.C. § 1981 and enforceable under §1983.  The Court also has jurisdiction over Plaintiff's state-law claims arising from related operative facts as Plaintiff's federal-law claims pursuant to 28 U.S.C. § 1367. The individual defendants had no discretion to abuse Plaintiff sexually or to violate her bodily integrity.  And there is no legitimate state interest in permitting the named defendants, in this case, to sexually harass and sexually assault Plaintiff.

9.      Additionally, at all relevant times in this suit, HCC was an "employer" as defined in Title VII and accepted federal funding and federal grant money. Thus, by accepting such federal monies, HCC had to and did expressly agree to waive its sovereign immunity relating to the type of sex discrimination, sexual harassment, sexual battery, and retaliation claims Plaintiff asserts in this case. *See Gruver v. La. Bd. of Supervisors for the La. State Univ. Agric. & Mech. Coll., 959 F.3d 178* (5th Cir. 2020) (governmental entity which accepts federal funds expressly waives its sovereign immunity as to discrimination claims).

10.      Venue is also proper in the Southern District of Texas because the events complained about in this case substantially occurred in this county and within this District and, specifically, the Houston Division. Additionally, one or more of the Defendants sued in this case resides in and/or has its principal place of business in this county and District. Finally, Plaintiff has satisfied all conditions precedent to bring the claims asserted in this case, including obtaining a Right to Sue letter from the EEOC.[6]

**III.**
**THE PARTIES**

---

[6] *See* Exhibit 1.

11.     Plaintiff Patricia Dodd is a Texas resident who lives in Houston, Harris County, Texas.

12.     Defendant Houston Community College—also sometimes referred to as the Houston Community College System ("HCC")—is a public education institution situated in Harris County, Texas. This defendant can be served by and through its Chancellor, Cesar Maldonado, who can be served at 748 W. 42nd St., Houston, TX 77018, or wherever he may be found.

13.     Cesar Maldonado is the Chancellor of HCC. He is a Texas resident and is being sued in his official capacity. He can be served with process at 748 W. 42nd St., Houston, TX 77018, or wherever he may be found.

14.     Robert Glaser was the Chair of HCC's Board of Trustees when he began and during the entire period of time that he was sexually harassing and assaulting Plaintiff.[7]  Some of his sexual misconduct occurred on HCC campuses, at HCC-sponsored events, and as a part of his purported duties carried out on behalf of the college for which he is now sued in his official capacity. Glaser can be served with process at 2127 Tangley St., Houston, TX 77005, or wherever he may be found.

## IV.
## NOTICE ALLEGATIONS

15.     Plaintiff is a single female who lives alone.  She depends on the salary she earns at HCC teaching English for her livelihood. She has successfully taught HCC students for more than eight (8) years and has had her HCC employment contract repeatedly renewed without incident until the events complained about in this suit.  Presently, she is just shy of 5 years from retirement.

---

[7] After Plaintiff filed her EEOC complaint against HCC, Maldonado and Glaser, Glaser was voted out as Chair of the HCC Board of Trustees.

16.     For most of her teaching years, Plaintiff had never personally met or known of Defendant Glaser.  The only knowledge she had of him was a vague understanding that he was one of the 9 HCC trustees.  That lack of knowledge changed in November 2019 when Plaintiff attended an HCC-sponsored event for staff and instructors.  Plaintiff attended the evening event alone and sat at a table with several of her co-workers.  Glaser was also at the table. He sat next to Plaintiff and quickly started directing his conversation to her.  He asked what Plaintiff did, how long she had worked at HCC, and queried her about how she enjoyed working at the college.  Plaintiff answered all questions respectfully—understanding now that she was speaking to a "trustee."  When it came to answering his question about how she liked working at the college, Plaintiff responded truthfully that she loved teaching the students but was encountering problems with school bureaucrats and administrators on campus.  She advised that she had tried to complain up the chain of command without meaningful success.  Having been diagnosed with Post-Traumatic Stress Disorder ("PTSD")[8] in 2009, Plaintiff told Glaser she feared her situation was worsening in her department because of petty administrative bickering.  Glaser took this information as an opportunity to tell Plaintiff he was in a position as trustee to look into and help her with her HCC problems and asked for her contact information. Plaintiff gave the trustee her HCC business card, which contained her contact information.   She thanked him for his offer of assistance, and she soon thereafter departed the table to go home.

17.     Plaintiff left the event with a few of her colleagues walking her to her car for safety since she was alone.  She left and went straight home.  That same evening, at around 10-10:30 pm, Plaintiff received a text message on her cellphone.  It was Glaser, the HCC trustee!  Glaser wrote that it was nice to meet her and started messaging her about different matters.  Plaintiff found the

---

[8] Plaintiff's PTSD related to the traumatic death of a parent and stresses in the workplace.

text conversation odd, especially late at night.  Earlier at the table, Glaser had told everyone he was married, so Plaintiff found it particularly strange and uncomfortable that he would be texting her late at night as a married man.

18.     Plaintiff knew nothing about this man other than he said he was an HCC trustee, and he was offering to help her.  After the text exchange ended, Plaintiff called one of her female friends, who had also been sitting at the table with Glaser.  She told the friend what had happened and how strange it was for him to be texting her so quickly.   The friend remarked that Glaser was out of line, but Plaintiff should just wait and see.  Plaintiff hoped Glaser's text was simply a product of being helpful or concerned and nothing else. Unfortunately, that would prove not to be the case.

19.     Glaser did not stop with his texts.  He repeatedly texted Plaintiff on her cellphone over the next few days under the pretense he was reporting back to her on what he was doing to make her situation at HCC better.  He stated that Chancellor Maldonado was his close friend and that he would get him (Maldonado) involved to help her, including making changes within the department. Plaintiff was encouraged, knowing now that both Glaser and Maldonado were working together to help her with her job.  Glaser kept in touch with Plaintiff over the Thanksgiving and Christmas academic breaks.  Things seemed to be improving at work for her.

20.     Plaintiff thanked Glaser for what appeared to be improvements she thought were the result of Glaser's efforts.  Glaser called her to celebrate the progress he was making at the college on her behalf and suggested taking her to a local bar in his neighborhood called The Big Easy Social and Pleasure Club located in Southampton. Plaintiff asked for the address to the bar and told Glaser she would meet him there.  However, Glaser insisted on picking Plaintiff up from her house in his car to take her to the bar he had chosen.  Plaintiff, therefore, provided him with

her home address, and Glaser picked her up around 7:00 pm and headed to the bar.  Plaintiff had

never been to Glaser's suggested bar before that evening, nor had Glaser been to her house before.

21.     After arriving at the bar, Plaintiff remembers sitting down and ordering up to three

(3) gin and tonic drinks.    After the drinks, Plaintiff has no recollection of anything else that

followed that night.  She did not see anyone put anything in her glass, and only she and Glaser

were sitting at the bar the entire time.   She did not remember leaving the bar, nor being driven

home, or how she got back into her house.  After consuming the drinks, Plaintiff's first memory

was waking up the next morning in her house with no clothes on and having sore thighs.  She was

alone in the house, and her house door was unlocked.  Plaintiff was frightened and could not recall

anything about leaving the bar and laid in bed confused—fearing the trustee may have tried to

have sex with her.  After inspecting her body, she was uncertain as to what had happened to her

that night.  Later the same morning, Defendant Glaser contacted Plaintiff and told her he had driven

her home, used her house keys to open the door, put her in bed, then said, "and we made out."

Plaintiff asked, "we made out?  What do you mean?"  Glaser's response to that question made no

sense.  Plaintiff felt dazed, ill, and confused.  She called her friend, a person who was also present

at the table the evening when Glaser first introduced himself at the HCC event.  The friend advised

Plaintiff to report Glaser to the police.  Who would believe her?  She had gone to the bar with him,

had some drinks there, he drove her to and from the bar, and she was in her house when he had

"made out" with her.  And, her livelihood at HCC would come to an immediate end since,

according to Glaser, he and the Chancellor were friends and working together to help her.  Since

she did not know what had happened exactly, and Glaser had admitted to making out with her, she

concluded he had done something to her body without her consent.

22.     Following that night, Glaser began physically showing up at Plaintiff's house, asking to be let in.  His visits to Plaintiff's home became incessant—nearly every weeknight—and Plaintiff's neighbors began commenting about this man coming to her house, knocking on the door, and sometimes leaving items on her mailbox.  One of the neighbors recognized Glaser as an HCC Trustee and threatened to tell HCC staff that Glaser was having an affair with Plaintiff.  To stop Glaser from making such a show in front of her house, and when Glaser would not stop coming to her house, Plaintiff allowed him into her house to discuss what he said would be a report on his efforts on her behalf at the college.

23.     Glaser told Plaintiff that he had talked to Maldonado to obtain permission to have his name and email address added to Plaintiff's HCC emails.   Glaser said he told Maldonado he wanted to be on Plaintiff's emails to show her supervisors that he was personally involved and watching how they were acting with Plaintiff in an attempt to protect her job.  Plaintiff was worried about the blowback she would face from the trustee's name being on her emails and felt that the real purpose for Glaser doing this was to spy on her to see with whom she was communicating. This suspicion was heightened when Glaser told her around January 2020 that he was jealous of her being around or talking to any other male.  Plaintiff had observed that when Glaser saw a man around her on campus, his mannerism and manner of dealing with her became more assertive and possessive.   His unwelcome behavior was making Plaintiff increasingly uneasy and uncomfortable. His controlling nature made Plaintiff feel as though she needed to be at his beck and call at all times, and it affected her social life, professional life, and her mental health.

24.     In order to be added to Plaintiff's email string, Glaser said he had apprised Maldonado.  The latter did not disapprove.  Having a trustee copied on the emails of an HCC

professor was not common practice and had to have been approved at the highest levels of the administration in the Chancellor's office.

25.     Glaser also began frequenting Plaintiff's campus.  These unusual "on-campus visits" drew the ire and attention of her supervisors.  They began questioning why a trustee was coming over to see Plaintiff and being copied on her emails.  Rather than helping, Glaser's actions were placing an administrative spotlight on Plaintiff.  With mounting problems on the job because of Glaser's conduct, Plaintiff turned to Renee Mack, an HCC Manager with the HCC Office of Institutional Equality—a part of the Human Resources function of the college— for help with the hostility from her supervisor and to apprise her of the situation and problems with Glaser.  She confided in Ms. Mack that she (Plaintiff) was feeling harassed by Glaser and wanted advice on what to do.  Mack declined to help, claiming that she would have to recuse herself if Plaintiff filed a complaint against Glaser.

26.     Plaintiff felt trapped!  She needed her job and income (~$70,000/year) to pay her bills.  Her job was her survival lifeline.  And now she was dealing with an HCC trustee who had admitted to having sexual relations with her when she was clearly incapacitated; who had gained access to her emails with the permission of his friend, the Chancellor; the trustee was now showing up on campus and at her house drawing the attention and ire of her supervisors and neighbors; and now the HR person who was supposed to help with Glaser's sexual harassment was claiming she was not able to intervene.  Plaintiff was at her wit's end. She couldn't go to Maldonado, the Chancellor, because he was Glaser's friend who himself was having an on-the-job affair with one of his staffers and who had approved Glaser's actions.  The Office of Institutional Integrity had declined to help.  And she could not appeal to the Board of Trustees because Glaser was the head of that Board.  Plaintiff was without recourse.

11

27.     Glaser knew Plaintiff was helpless and vulnerable.  Nevertheless, he increasingly insisted on coming to her house, where he sat on her couch for hours before beginning to play with his penis in full view of Plaintiff.  Over time, he would try to, and eventually did, begin groping Plaintiff's body—always stating that he needed to feel her because he had a frigid woman at home. Glaser escalated his sexual harassment and exploitation of Plaintiff on campus and repeatedly called and texted her cellphone after she finished teaching to arrange his sexual trysts with her.

28.     Glaser's sexual misconduct with and harassment of Plaintiff became so twisted that he would text her while attending HCC trustee meetings making explicit remarks about what was being discussed both in closed and public sessions and scheduling to meet up with Plaintiff for sex when the trustee meeting was over.   Once, Glaser was at home and called Plaintiff to tell her he was masturbating while thinking of her and wanted her to stay on the line until he "got off"— which he said he accomplished later in the call.  He also captured a second episode of his masturbating and ejaculating on a video which he sent to Plaintiff while he was out of town in a hotel room while attending an HCC-sponsored event.  The video has the caption, "For You!" Glaser's sexual harassment of Plaintiff was growing more perverted by the day.  And he began insisting Plaintiff take nude pictures of herself and send them to him.  The height of his recklessness came when he insisted on having sex with Plaintiff without protection.  He said a condom would prevent him from "getting it up."[9]

29.     Glaser's sexual abuse of Plaintiff reached its zenith when Maldonado planned an HCC event in Washington, DC, in February 2020.  The event was to start in the District on a Monday.  Glaser insisted Plaintiff travel with him to the event, which was being paid for with

---

[9] Glaser's *quid pro quo* sexual harassment and sexual exploitation of Plaintiff did not end with his demands for physical sex.  Suffering from performance issues, he continually insisted Plaintiff write and text him sexually explicit messages and expressions of her admiration for him in order to make him feel like a man.

taxpayer dollars.  Glaser paid for Plaintiff to travel and scheduled both of them to arrive in DC

three (3) days before the conference was to start.  He paid for a single room at the St. Regis Hotel.

In his words, he wanted to have a lot of "fun" with Plaintiff which ultimately proved to mean a lot

of sex with her.  Plaintiff and Glaser flew up together on Flight 5749 on February 7, 2020. They

were picked up at the airport by a town car paid for by HCC and taken to the St. Regis Hotel.  But

for Glaser's offer to help a woman in a precarious job situation, and with his demonstrated ability

to get the Chancellor to do whatever he wanted, Plaintiff would never have submitted to Glaser's

sexual harassment.

**V.**
**GLASER'S CONDUCT WITH PLAINTIFF WAS CONSISTENT WITH HCC'S *DE*
*FACTO* SEXUAL HARASSMENT CUSTOM, PRACTICE AND POLICY OF
ALLOWING POWERFUL MALE SUPERVISORS TO SEXUALLY HARASS FEMALE
SUBORDINATES WITHOUT APPROPRIATE REDRESS**

30.     Glaser's sexual harassment of Plaintiff was but another instance of HCC's *de facto*

sexual harassment practice and custom, which tolerated powerful male supervisors preying on

vulnerable female employees.  Stated differently, contrary to its written anti-sexual and gender

discrimination policies, HCC's effective *de facto* practice, policy, and custom actually made

exceptions when the male had superior authority over a  female employee or because the male was

a perceived friend of or doing something for the Chancellor.  In such instances, the sexual

harassment was either tolerated, indulged, or overlooked entirely.

31.     As mentioned *supra*, contemporaneous with Glaser's sexual exploitation and

harassment of Plaintiff the Chancellor himself was carrying on a *quid pro quo* sexual affair with a

subordinate married female.  Maldonado was so brazen and unapologetic about his affair in the

workplace that when the married female thanked her husband for being the best thing that ever

happened to her, Maldonado took offense and  publicly stated something to the following effect:

"I thought I was the best thing that ever happened to you."  This disgraceful and embarrassing remark was made in the presence of a crowd and alarmed many in attendance. Notwithstanding widespread knowledge of the Chancellor's sexual misconduct—one which saw the paramour repeatedly promoted by the Chancellor—his conduct went entirely unpunished and unaddressed. Indeed, the trustees continually renewed his employment contract despite Glaser's knowledge of his misconduct.

32.     Another instance where Maldonado demanded his sexual exploitation of the subordinate female[10] go unpunished occurred when two HCC police officers were called in to investigate the woman's complaints about a domestic matter related to what Maldonado was doing with her.   As the officers prepared to interview the woman, Maldonado demanded he sit in on the interview—a request that was contrary to the HCC police operating protocol.   Maldonado threatened the officers that he was their boss and they had to follow his instructions or he could fire them.  When the officers continued to ask Maldonado to leave the interview, he did not and began coaching the female on what to say in response to the officer's questions.[11] The fact that Maldonado threatened the officers with termination if he disliked what they were asking the female, and his further refusal to leave the interrogation room so he could coach the female on what to say, are compelling facts suggesting that he believed himself to be above the law and that he could continue sexually exploiting the subordinate female without any adverse consequences. To this day, HCC is not known to have taken any disciplinary or criminal action against Maldonado even though his conduct is not a secret—i.e., the HCC police department knows about it, members of HCC's Human Resources department know about it,  and Glaser admitted to knowing about it.

---

[10] To protect the married HCC employee her name is not included in this complaint but is available to be supplied if required.

[11] This interrogation is said to have been recorded on the officers' body cameras and that  footage is presently under administrative lock on HCC's computer system.

33.     As the Chair of the Board of Trustees, Glaser knew about and talked to Plaintiff about Maldonado's illicit sexual misconduct and took no actions to address it.  And, even though Maldonado's conduct was talked about among others, none of them stepped forth to investigate or correct Maldonado's misbehavior.  Rather than correct Maldonado, Glaser used it to support his own wrongdoing with Plaintiff.  When Plaintiff complained to Glaser that his conduct of requiring sex to help her was wrong, Glaser simply remarked it is okay because the Chancellor himself "is doing the same thing with xxxx's[12] wife." Thus, the two most powerful policymakers at HCC ratified each other's sexual harassment and sexual exploitation of female employees, and no one else at HCC, including the trustees,  took any action to correct or address their behavior. Such ratification was not by omission—rather, the Defendants knew about the wrongdoing and did nothing about it.

34.     Glaser and Maldonado, unfortunately, were not the only male beneficiaries of HCC's grotesque *de facto* sexual harassment policy that permitted females to be victimized. Following are other instances of this permitted conduct:

    a.     Charles "Chuck" Smith (WM), engaging in sexual misconduct with a subordinate female with only a wink and nod from Maldonado and his administration;

    b.     Rogelio Anastasia (HM), having repetitive sex with a subordinate female without any reasonable corrective action taken by the Maldonado or his administration;

    c.     James Bailey (WM), having sex with and sexually harassing subordinate Black female without any reasonable corrective action taken to stop or address his victimization of the female subordinate;

    d.     William "Bill" Carter (WM), engaging in continual sexual acts on the job with subordinate female employee without reasonable corrective actions being taken by Maldonado or his administration;

---

[12] The name of the husband is omitted.

    e.      Alan Ainsworth (WM), engaging in sexual harassment and assault on the job with a subordinate female employee without corrective actions being taken and requiring the assault victim to remain under the supervision of the assaulter;

    f.      HCC Police Chief Greg Cunningham (WM) and HCC Police Captain John Dziedzic (WM) failed to report sexual harassment engaged in by HCC officers even though Texas law required any law enforcement officer to be terminated if found guilty of such sexual harassment.  Both officers were found guilty of the sexual harassment, but instead of terminating them as required by law, the Maldonado administration permitted the officers to merely resign which allowed them to continue as police officers somewhere else.

    g.      HCC Police Chief Greg Cunningham (WM) would have direct knowledge of the investigation of Maldonado's sexual misconduct with the subordinate female but is believed to have tried to bury that investigation.

35.     The above are but a few of the numerous instances of HCC's widespread custom, policy and practice of deliberately turning a blind eye to known sexual predation and sexual harassment in the workplace. By refusing to correct the conduct of the offenders, HCC, by and through its policymakers and decision-makers, ratified and approved the perverse actions under the effective *de facto* practice and custom of tolerating such behavior.[13]

## VI.
## WHEN THE SEX STOPPED, HCC'S RETALIATION CONTINUED

36.     Plaintiff ended Glaser's *quid pro quo* sexual harassment.  After HCC officials refused to help her with the problem, Plaintiff took matters into her own hands and threatened to tell Glaser's wife to stop what he was doing.  With Plaintiff's decision to end Glaser's sexual harassment, HCC ramped up its retaliation against her.  Each of the following actions occurred: 1) Glaser's name was removed from Plaintiff's emails;  2) Glaser told Plaintiff he could no longer help her with her employment issues because it would conflict with his role as Chair of the HCC

---

[13] The Supreme Court and Fifth Circuit have recognized that "a policy maker could 'ratify' a subordinate's illegal conduct, thus putting the force of a municipal policy behind it[.]" *Milam v. City of San Antonio*, 113 F. App'x 622, 626 (5th Cir. 2004); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion). ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final").

Board of Trustees—a statement that completely contradicted the conduct he had been engaging in with Plaintiff up to the time the sex stopped; 3) HCC's supervisors increased their efforts to terminate Plaintiff and Glaser offered no assistance; and 4) Plaintiff's employment contract was not renewed within days of her filing her EEOC Charge of Discrimination against HCC, Maldonado, and Glaser.[14]

37.     Additionally, even though Plaintiff has been on a medical leave of absence and has supplied two separate medical opinions that her condition requires reasonable accommodations, HCC required her to send daily "check-in" emails even though HCC has failed to identify the policy that requires such daily notices.[15] Plaintiff alleges HCC retaliated against her because she rebuffed Glaser's sexual harassment/exploitation and because she filed her EEOC Charge of Discrimination relating to Glaser's and Maldonado's sexual misconduct.

## VII.
## HCC RATIFIED GLASER'S AND MALDONADO'S SEXUAL HARASSMENT OF PLAINTIFF AND ACTED CONSISTENT WITH HCC'S *DE FACTO* CUSTOM AND PRACTICE

38.     At all relevant times, Chancellor Maldonado was a principal policymaker and implementer of the relevant *de facto* practices, policies, and customs alleged in this case and the principal ratifier of the complained-of conduct.  While the HCC Board of Trustees may have had

---

[14]HCC will claim that its decision not to renew Plaintiff's teaching contract was based on other immaterial factors—none of which impugned or questioned her teaching ability.  Principal among the alleged grounds for ending her 8+ years of teaching was Plaintiff's failure to report two arrests for which she was never convicted.  Based on information and belief at the time of this filing, Plaintiff intends to show that this basis for terminating Plaintiff was pretextual because  other HCC employees have not been similarly treated.  Additionally, Plaintiff will show that such rationale for terminating Plaintiff's employment on such a technical basis, while tolerating blatant sexual misconduct perpetrated by its primary policymakers, is additional proof of the selective nature of HCC's enforcement of rules.  Maldonado and Glaser could openly violate rules and keep their positions, while HCC claims it had to terminate Plaintiff's employment because of an immaterial rule infraction.

[15] *See* Exhibit 2, May 26, 2021 email from Plaintiff's counsel asking HCC's lawyer to identify and provide the policy requiring such a daily "check-in" practice.  The lawyer has not responded to the request.

powers to act, they abdicated their powers and surrendered them to its Chairman and Maldonado.[16] Maldonado and Glaser controlled what was placed on the Board's agenda to consider.  And, just as Maldonado told the HCC police officers investigating his misconduct with the paramour, "[he] was their boss, and [he] could fire them if they did not do what [he] wanted."  That was how Maldonado governed all aspects of the college—such a proclamation by him was not subject to prior approval or endorsement by the Board of Trustees.

39.     Importantly, Glaser's sexual misconduct with Plaintiff occurred while he was HCC's Board of Trustees Chair.  Glaser admitted he was the personal friend of the Chancellor and could get the Chancellor to help him with Plaintiff's employment issues.  And, consistent with those statements, Glaser demonstrated he had obtained "chancellor help" by 1) being allowed to monitor and be carried on Plaintiff's emails, 2) allowing him to transport Plaintiff in the HCC paid town car in D.C., 3) allowing Glaser to show up at Plaintiff's classes and on campus without restrictions, 4) pretending not to see Glaser's sexual harassment and exploitation of Plaintiff, and 5) taking no action to reprimand or hold Glaser responsible for his wrongdoing.  In effect, Glaser was insulated from punishment because of his friendship with and actions of Maldonado to protect him.  Glaser and Maldonado, both HCC final *de facto* and actual decision-makers/policymakers, ratified each other's known sexual harassment with subordinate female employees. Therefore, such ratification constitutes the official custom,  practice, and policy of HCC during the relevant time period involved in this case.[17]   There were no higher policymakers at HCC than the

---

[16] During the events in question neither the Board of Trustees, its Chairman, nor Maldonado did anything to address the obvious sexual wrongdoing at the college.   As such, the Board, its chair, and Maldonado all knowingly ratified the offensive and sexually discriminatory conduct alleged in this case.

[17] Here, both Glazer and Maldonado had reciprocal actual knowledge of each other's misconduct with female subordinates and ratified the behavior. "The existence of a policy can be shown through evidence of an actual policy, regulation, or decision that is officially adopted and promulgated by lawmakers or others with policymaking authority." *Valle v. City of Houston.*, 613 F.3d 536, 542 (5th Cir. 2010). Alternatively, a plaintiff can satisfy the policy

Chancellor (Maldonado) and the Chair of the HCC Board of Trustees (Glaser) relating to the issues being litigated in this case.[18]

40.     HCC is legally liable for the wrongdoing perpetrated by Glaser and Maldonado in their official capacities for at least one or more of the following reasons:  1) their actions as state actors and final decision-makers, in their official capacity, is the action of the governmental entity; 2) Maldonado and Glaser's conduct with females was consistent with the widespread, and persistent *de facto* custom, practice and policy of HCC; and 3) their conduct was ratified on behalf of HCC by the final decision-maker.   Glaser clearly knew Maldonado was having sex with a subordinate married female employee because he expressly told Plaintiff Maldonado was doing so.  Yet, with that actual knowledge of wrongdoing, Glaser took no action as chair of the Board of Trustees to address, investigate, or stop Maldonado's abuse. Likewise, Maldonado assisted Glaser's sexual misconduct against Plaintiff by allowing Glaser to monitor and access her emails and permitted him to "pop in" on Plaintiff's classes without correction, and with actual or constructive knowledge accommodated Glaser's sexual escapades with Plaintiff in DC.   Stated differently, Plaintiff alleges Glaser and Maldonado's conduct were the official acts of HCC or were performed as state actors under color of state law consistent with the effective *de facto* policy and practice of the college with allowed power men to victimize and sexually harass vulnerable subordinate women without meaningful correction, and their conduct was ratified.[19]

---

[18] Importantly, Chancellor Maldonado and Chair Glaser were the principal HCC policymakers who set the agenda for the Board of Trustees to consider and vote on.  Thus, their decisions to ratify the misconduct of each other constituted the final official action on the matters being alleged in this case.

[19] In this case, the adage a fish rots from the head down is appropriate.  HCC's top leadership, Glaser and Maldonado, were HCC's head policymakers infecting the college with an environment of sexual predation, sexual harassment and sexual misconduct against female employees.  As the Fifth Circuit wrote in *Valle v. City of Houston.*, 613 F.3d 536, 542 (5th Cir. 2010), "The existence of a policy can be shown through evidence of an actual policy, regulation, or decision...*or others with policymaking authority*."

element by showing that there is a persistent, widespread practice of officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents policy. *Burge v. St. Tammany* Par., 336 F.3d 363, 369 (5th Cir. 2003).

**VIII.**
**CAUSES OF ACTION**[20]

**A. Unreasonable Bodily Intrusion in Violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution; Alternatively, Violations of Title VII, and Tex. Lab. Code Section § 21.001.**

41.    Glaser was a state actor operating under the color of law when he committed to helping Plaintiff address her employment struggles at HCC.  At all times in question, he was the Chair of the HCC Board of Trustees and made his commitments to Plaintiff in that capacity.

42.    Glaser told Plaintiff that he had secured the HCC Chancellor's help to address her employment issues and demonstrated that assistance in all the ways identified above.  And, related to the "help" he was offering at the college and the apparent success, he told Plaintiff they would celebrate what he was doing by having drinks at a neighborhood bar where he lived.  He paid for the drinks.   And, he insisted on driving his car to pick up Plaintiff.  To accommodate his demand, Plaintiff had to provide Glaser her home address for him to pick her up. This is the most likely way Glaser learned where she lived since he had never been to her home before.

43.    After picking Plaintiff up at her house, Glaser drove the two of them in his vehicle to his chosen bar.  They sat at the corner of the bar—just the two of them—and they each ordered a drink.  Glaser began explaining how his assistance for her at the college was being handled. After several gin and tonics, Plaintiff began feeling disoriented, in a daze, and not herself. Eventually, she seemed to "blackout" and did not know what was happening.  Plaintiff does not remember anything more that night after consuming the few drinks.  Plaintiff does not remember anyone other than Glaser and the bartender approaching or sitting with them.   Plaintiff does not remember any of the following: how or when she left the bar, anything about Glaser driving her

---

[20] Plaintiff incorporates by reference all prior notice allegations above for purposes and in support of each of the causes of action asserted in this complaint.

20

back to her house, how she got back into her house, or what happened inside her house that night. The first thing Plaintiff remembers after being at the bar with Glaser was waking up the next morning in her bed without any clothes on and having sore thighs.

44.    Within an hour or so after Plaintiff woke up, Glaser called.  She immediately told Glaser she did not remember anything from the previous night after drinking a few drinks.  Glaser spoke up and volunteered the following statement: "I took you home, we made out, and I tucked you in and left."  Plaintiff could not believe what he said.  She had never consented to having sex or engaging in anything physical with Glaser, and his conduct was unwelcome, and now he was telling her, "we made out," and she now had sore thighs.  Plaintiff was frightened and anguished over what had happened and called her friends for counseling, guidance, and consolation.

45.    Glaser's making out with an incapacitated Plaintiff was a violation of her right to bodily integrity.  As a state actor, purportedly discussing college business with Plaintiff at a bar, Glaser was cloaked with the imprimatur of the college.  He had no right to "make out" with Plaintiff without her consent.  The fact that Glaser admits to this fact, and was aware Plaintiff was incapacitated at the time because he had to tell her what happened, is some evidence he knew he had taken advantage of a person who had not given—and could not have given—effective consent to any sexual act or for him to have made out with her.  Plaintiff was deported of her due process and equal protection rights because her bodily integrity was violated without procedural or substantive due process by a governmental actor acting under color of state law.  Additionally, Glaser was acting consistent with HCC's *de facto* sexual harassment practice and custom. Plaintiff, therefore, brings her claims against Glaser, in his official capacity, and HCC for denial of her due process and equal protection rights in violation of Plaintiff's rights pursuant to the Fourteenth Amendment to the Constitution, which are actionable pursuant to 42 U.S.C. §1983.

21

46.     Plaintiff alleges Glaser, acting under color of state law, enticed her to ride in his vehicle to an specified bar, to talk about activities at the college he was engaging for Plaintiff, and after she was incapacitated and unable to grant effective consent to any sexual act, unlawfully invaded and violated her bodily integrity in violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. *See Shillingford v. Holmes*, 634 F.2d 263, 265 (5th Cir.1981) ("[t]he right to be free of state-occasioned damage to a person's bodily integrity" is protected by the Fourteenth Amendment's guarantee to substantive due process). Government actors who engage in non-consensual sexual contact with individuals under their authority deprive those individuals of liberty without due process of law in violation of the Fourteenth Amendment, which includes the right to bodily integrity.  *See* U.S. CONST. AMEND. XIV § 1; *also Doe v. Taylor Indep. Sch. Dist.,* 15 F.3d 443, 451 (5th Cir. 1994) (en banc) (individuals have a right to be free from sexual assaults committed under color of law just as they have a right to be free from other unreasonable physical assaults); citing *Shillingford v. Holmes*, 634 F.2d 263, 265 (5th Cir.1981) ("[t]he right to be free of state-occasioned damage to a person's bodily integrity" is protected by the Fourteenth Amendment's guarantee to substantive due process). Acts of sexual misconduct include *sexual assault without consent*, sexual contact procured by force, threat of force or coercion, and *unwanted or gratuitous sexual contact* such as touching or groping. There are also instances where taking of nude photographs, staring, leering, and ogling may suffice.

### B.  Violation of Title VII of The Civil Rights Act of 1964

#### i.) Per Se Sexual Harassment

47.     Plaintiff is a single female.  Defendant HCC is an employer as defined in 42 U.S.C. §2000e(b) of Title VII.  At all relevant times material to this case, HCC employed more than 500 employees.  And, the Defendants were at all times aware that Plaintiff was female.

48.     Plaintiff timely complied with all prerequisites of administrative relief required under Title VII and has obtained a Right to Sue letter from the EEOC to proceed in court with this lawsuit.[21]

49.     The collective complained-of conduct of HCC, Maldonado, and Glaser, the latter two in their official capacities, were deliberately performed under color of state law in violation of Title VII of the Civil Rights Act of 1964.  These defendants created a sexually hostile workplace for Plaintiff and other female employees.  Under the leadership of Maldonado and Glaser, HCC has created, promoted, adopted, ratified, and endorsed a *de facto* policy, custom, and practice of tolerating sexual harassment of subordinate female employees who are being made to submit to the sexual desires of superior male supervisors without effective or reasonable redress.  Both Glaser and Maldonado not only promoted such policies and practices, they embodied those policies as final policymakers who themselves practiced such sexual predation throughout the time Plaintiff was being victimized.

50.     The sexual harassment of Plaintiff included Glaser monitoring her emails and communications on campus to dissuade male suitors from talking or engaging in social activities with Plaintiff; showing up on campus to arrange times for him to meet up to have sex with Plaintiff; texting Plaintiffs sexually explicit photographs and videos of him masturbating and ejaculating; calling Plaintiff and asking her to stay on the phone until he "got off" while he was masturbating; having sex or sexually groping Plaintiff while she was visibly and clearly incapacitated and unable to grant consent for such sexual touching; exposing his genitals to Plaintiff and asking her to please him; asking Plaintiff to cross state lines to travel out of town for sex during an HCC event; requesting Plaintiff send nude pictures of herself; asking Plaintiff to act like she wanted him

---

[21] See Exhibit 1, EEOC Right to Sue letter.

sexually to address performance issues he was struggling with, and promising to help with Plaintiff's employment issues at HCC in exchange for sexual favors.

51.     Plaintiff was directly damaged by such actions which were performed consistent with HCC's *de facto* policy, custom, and practice of subordinating female employment rights to the sexual desires of men in power at HCC.  Plaintiff seeks to recover compensatory and punitive damages,  attorney fees,  and costs as allowed by law. See Tex. Labor Code. 21.001 and Title VII of the Civil Rights Act of 1964.

**ii.) *Quid Pro Quo* Sexual Harassment**

52.     Plaintiff is a single female.  Defendant Glaser, in his official capacity, was the Chair of the HCC Board of Trustees at all relevant times involved in this case.  As the Chair of HCC's Board of Trustees, he promised to obtain the help of his friend, the HCC Chancellor—Defendant Maldonado—to assist with protecting Plaintiff from her hostile work environment and protect her job.  That promise, however, came with strings attached—Glaser would insist on being provided sex for his and the Chancellor's help.

53.     The complained-of *quid pro quo* sexual harassment perpetrated by Glaser was deliberately performed under color of state law in violation of Title VII of the Civil  Rights Act of 1964 and 42 U.S.C. § 1983.  Glaser's conduct created a sexually predatory and hostile workplace for Plaintiff.  He was copied on Plaintiff's emails, stopped by her classes at will, sent Plaintiff a video of him masturbating, called Plaintiff to tell her he was masturbating and ejaculating while on the phone, and paid for Plaintiff to travel across state lines to have sex with him for days in Washington, DC. And, when Plaintiff refused his requests for sexual favors, he retaliated by withdrawing all suggested help from her resulting in Plaintiff's employment being further imperiled and ultimately ending.   Glaser was a final HCC policymaker at all times that he was

trading favors for sex with Plaintiff, and his *quid pro quo* sexual harassment was continually conducted both at and away from HCC campuses.

54.     Plaintiff was directly damaged by such actions which were performed consistent with HCC's *de facto* policy, custom, and practice of subordinating female employment rights to the sexual desires of men in power at HCC.  Plaintiff seeks to recover compensatory and punitive damages,  attorney fees,  and costs as allowed by law. See Tex. Labor Code. 21.001; Title VII of the Civil Rights Act of 1964.; 42 U.S.C. 1983.

## C.  Retaliation and Hostile Workplace

55.     Plaintiff is a single female.  Defendant HCC is an employer as defined in 42 U.S.C. §2000e(b) of Title VII.  At all relevant times material to the asserted claims, HCC employed more than 500 employees.  And,  Defendants were at all times aware that Plaintiff was female.

56.     Plaintiff timely complied with all prerequisites for required under Title VII and has obtained a Right to Sue letter from the EEOC to proceed in court with this lawsuit.

57.     The complained of conduct of HCC, Maldonado, and Glaser, the latter two in their official capacities, were deliberately performed under color of law in violation of Title VII of the Civil Rights Act of 1964 and actionable also under 42 U.S.C. 1983 relating to sexual predation on female employees. These defendants created a sexually hostile workplace for Plaintiff and other female employees.  Under the leadership of both Maldonado and Glaser, HCC promoted, adopted, ratified, and endorsed a *de facto* policy, custom, and practice of engaging in and tolerating sexual harassment of female employees by more superior male supervisors.  Both Glaser and Maldonado not only promoted such policies and practices, they also were final policymakers who implemented, practiced and personified those practices under color of state law.

58.     Plaintiff's hostile workplace included each of the following actions: an HCC trustee monitoring her emails and communications on campus; a trustee being jealous of her socializing with any other male at work; being asked to arrange sexual encounters with the trustee while at work; receiving explicit sexual photographs and videos of an HCC trustee; being requested to listen to and watch sexual acts of the trustee masturbating; being exposed to the privates of the trustee and having her show up at her classes, on campus, and at Plaintiff's house, being groped; being required to "check in" while on medical leave of absence; having her employment contract cancelled and not renewed after she refused to have sex with the trustee and filed her EEOC complaint; and suffering unemployment when she has not been found guilty of any crime while Maldonado and Glaser continue in their HCC positions after either being discovered to have exploited females at HCC or admitted to doing so.  Again, the retaliation and hostile workplace claims in this case manifest HCC's *de facto* sexual harassment practices and policies that favor male predators over female victims.

59.     Plaintiff was directly damaged by defendants' retaliation and hostile workplace which were performed consistent with HCC's *de facto* policy, custom, and practice of subordinating female employment rights to the sexual desires of men in power at HCC.  Plaintiff seeks to recover compensatory and punitive damages, attorney fees, and costs as allowed by law. See Tex. Labor Code. 21.001; Title VII of the Civil Rights Act of 1964.; 42 U.S.C. 1983.

**D. *Monell* Liability of HCC**

60.     Plaintiff is a single female.  Defendant HCC was her employer at all times involved in this case and had more than 500 employees.  HCC policymakers knew at all times that Plaintiff was female and engaged in the conduct alleged in this case because she was female.

61.     After Maldonado's appointment as Chancellor of HCC in May of 2014, he began an extramarital affair with a subordinate female working at HCC.  Both Maldonado and the female were married, and the affair, though against HCC written policy, was widely known including by the Chair of the HCC Board of Trustees.  Indeed, the Trustee Chair was a friend of the Chancellor, repeatedly told Plaintiff he knew of the sexual misconduct Maldonado was engaging in with the subordinate female—yet no action was taken at HCC to correct the conduct.

62.     Maldonado's misconduct with his subordinate paramour became so well known that the husband of the paramour apparently became somewhat belligerent with his wife.  In response, Maldonado and/or his paramour called the HCC police department to file a complaint. Based on information and reasonable belief, two HCC police officers commenced an investigation of the matter, including interviewing the paramour. However, Maldonado refused to leave the room when the officers attempted to interview the woman.  One of the officers, following HCC protocol, asked Maldonado to leave the room while they questioned the female only to have Maldonado tell them he was not leaving the room.  Maldonado then sternly warned the officers that he (Maldonado) was their boss and could fire them—implying they had to follow his rules in the interrogation or lose their jobs.  The paramour was thereafter interviewed with Maldonado present.  Maldonado is said to have coached the woman on what to say and not say during the interview.  Such conduct by Maldonado and the paramour shows Maldonado's consciousness of guilt, attempt to interfere with a criminal investigation, and tampering with a witness.

63.     Knowing of Maldonado's sexual misconduct on campus, Glaser engaged in the same misconduct with Plaintiff.  While Maldonado's paramour received numerous promotions and career advances during the time she was working at HCC, Glaser was promising to "protect" Plaintiff's job in exchange for a sexual relationship.  Maldonado and Glaser— the final relevant

policymakers at HCC—established, approved, and personified HCC's *de facto* practice, policy, and custom of tolerating male predation and harassment of female employees at the victims' expense. The fact that the two final policymakers themselves were practicing the very *de facto* policy and practice without correction is sufficient evidence to establish the complained of institutional HCC policy.  However, in addition to the policymakers' conduct, their actions infected the entire organization with numerous similar acts of sexual predation against female employees taking place without reasonable corrective action being taken to curb or correct the conduct.[22]

64.     HCC's *de facto* policy created a workplace for Plaintiff and other female employees that not only encouraged sexual misconduct but condoned such conduct even when it was known to be occurring.  As such, Plaintiff alleges this policy, custom, and practice was sexually discriminatory in violation of Plaintiff's rights under 42 U.S.C. § 1983 and the Fourteenth Amendment to the Constitution.  The policy was so widespread, persistent and ongoing it satisfies two bases for *Monell* liability against HCC: 1) the policy was approved by the final policymakers, and 2) the practice of the policy was so widespread, persistent and ongoing as to constitute the approved policy of HCC.

65.     Plaintiff was directly damaged by *de facto* sexual harassment that favored male predators over their female victims. Plaintiff seeks recovery of compensatory and punitive damages, attorney fees, and costs as allowed by law.  See 42 U.S.C. 1983.

**E.  Violation of Plaintiff's Rights Under the ADA**

---

[22] *See* Pages 14-15, *supra*.  Importantly, Plaintiffs have no records or information that HCC's Board of Trustees or Human Resources Department took any corrective actions against Maldonado or Glaser while Plaintiff was being victimized at HCC.

66.     Plaintiff also asserts a claim for HCC's violation of her rights to reasonable accommodations under the Americans with Disabilities Act ("ADA") and Chapter 21, Texas Labor Code. These laws prohibit employers from discriminating against applicants or employees with disabilities in job application, procedures, conditions and privileges of employment. Chapter 21 of the Texas Labor Code applies to all state and local governmental entities. And, a qualified individual under these laws has to meet one or more of the following requirements:

- have a physical or mental disability that substantially limits one or more major life activities;

- have a record of having a disability; or

- be regarded as having a disability.

67.     Plaintiff was diagnosed with PTSD by at least two different doctors qualifying her to be granted reasonable workplace accommodations due to her disability. Even though Plaintiff has been on medical leave of absence, her disability is continuing. HCC was required to provide her reasonable accommodations but instead insisted that she report daily; such an action was more retribution than an accommodation. Plaintiff has been satisfying her teaching duties, and the daily "check-in" emails was an unreasonable demand which further aggravated her PTSD. Plaintiff has medical opinions supporting this fact. The "check-ins" was really a retaliatory act by HCC because 1) Plaintiff had a disability which allowed her to be in medical leave of absence, and 2) because of her EEOC complaints against HCC, Glaser, and Maldonado.

## IX.
## PRAYER

68.     This Court has jurisdiction over the federal and related state law claims asserted in this case. Defendants' immunity has been expressly waived by the laws referenced above, and because HCC has accepted federal grant funds, the Defendants' immunity from suit has been

waived. *Gruver v. La. Bd. of Supervisors for the La. State Univ. Agric. & Mech. Coll., 959 F.3d 178* (5th Cir. 2020) (governmental entity which accepts federal funds expressly waives its sovereign immunity as to discrimination claims). Accordingly, Plaintiff asks that all Defendants be served with process, and judgment be entered for Plaintiff, against Defendants, and she recover her compensatory and punitive damages up to $15,000,000, including lost past and future lost income, lost health, pension, and retirement benefits, mental anguish damages, attorney's fees, costs and such other and further relief to which she may be entitled.

Dated: July 8, 2021                           Respectfully submitted,

                                              **The HALL LAW GROUP, PLLC**

                                              */s/ Benjamin L. Hall, III*
                                              **Benjamin L. Hall, III**
                                              State Bar No. 08743745
                                              Federal Bar No. 8787
                                              bhall@bhalllawfirm.com

                                              -AND-

                                              **The HITTNER GROUP, PLLC**

                                              **George J. Hittner**
                                              State Bar No. 24038959
                                              S.D. TX No. 431901
                                              george.hittner@thehittnergroup.com
                                              P.O. Box 541189
                                              Houston, Texas 77254
                                              Phone: (713) 505-1003

                                              -AND-

                                              **JIMMY ARDOIN**
                                              **& ASSOCIATES, PLLC**

                                              **James Ardoin**
                                              State Bar No. 24045420
                                              S.D. TX No. 571281

4900 Fournace Place, Suite 550
Houston, Texas 77401
Phone: (713) 574-8900
Toll Free: (888) 701-8509
Email: jimmy@jimmyardoinlaw.com